# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 34
In the Matter of Walt Disney Company and Consolidated Subsidiaries,
  Appellant,
  v.
Tax Appeals Tribunal of the State of New York et al.,
  Respondents.
----------------
No. 35
In the Matter of International Business Machines Corporation & Combined Affiliates,
  Appellant,
  v.
Tax Appeals Tribunal of the State of New York et al.,
  Respondents.

Case No. 34:

Marc A. Simonetti, for appellant.
Frederick A. Brodie, for respondents.
Institute for Professionals in Taxation, amicus curiae.

Case No. 35:

Jeffrey A. Friedman, for appellant.
Frederick A. Brodie, for respondents.

CANNATARO, J.:

Under a taxation scheme in effect from 2003 through 2013, New York allowed corporations that paid franchise taxes in New York to deduct income received as royalty payments from members of the same corporate group, or family, in calculating their taxable

income.  The deduction was allowed only if the royalty payment came from a related entity that had already paid a New York tax on the same income through operation of another provision in the Tax Law that required companies to add back royalty payments made to related entities for the purposes of calculating their own taxable income.

In these cases, the state Department of Taxation and Finance determined that appellants improperly deducted royalty payments they received from affiliates in foreign countries that were not subject to New York franchise taxes and, so, were not required to add those payments back on a New York tax return. Appellants challenge the Tribunal's denial of the deduction as being contrary to the clear language of the statute and as violating the Commerce Clause's prohibition on discrimination against foreign commerce.  Because the Appellate Division correctly interpreted the statutes as permitting a tax deduction only where a related subsidiary was subject to the add back requirement, and because any burden on interstate or foreign commerce created by this tax scheme was incidental and did not violate the dormant Commerce Clause, we affirm.[1]

## I.

Corporations that do business in New York must pay an annual franchise tax (Tax Law article 9-A).  During the years in question, corporations reported their article 9-A tax liability based on the greatest of four alternative bases, the most common of which was "entire net income" (ENI) allocated to New York (former Tax Law § 210 [1] [a]).  At that

---

[1] We note that the subject tax scheme was repealed over a decade ago and so our holding today has no direct applicability to the current scheme for taxing royalty payments between related entities.

time, ENI generally consisted of the taxpayer's entire federal taxable income (FTI) with statutorily enumerated modifications that either added to or subtracted from the federal taxable income (*see id.* § 208 [9]). The portion of a company's ENI that was taxable in New York was determined using the business allocation percentage (BAP) (*id.* § 210 [3] [a], [b]). The BAP was determined by, among other things, comparing a taxpayer's business receipts from New York to its total business receipts from all sources (including related-member royalties) (*id.* § 210 [3] [a] [2]). For the purposes of BAP calculation, receipts from intangibles such as royalties on intellectual property (IP) were allocated to the jurisdiction in which the IP was used (*see id.* § 210 [3] [a] [2] [C]; *see also* former 20 NYCRR 4-4.6).

Prior to passage of the subject tax scheme in 2003, royalty receipts were included in all taxpayers' ENI. Large multinational conglomerates regularly avoided state taxes on income derived from intellectual property (IP). For example, a parent corporation[2] would transfer its IP assets to a subsidiary holding company located in a jurisdiction that had little or no tax on income from intangible assets. The subsidiary would, in turn, license the IP back to the parent in exchange for royalty payments, which were typically excluded from the parent company's FTI as deductible business expenses. The foreign subsidiary would

---

[2] The terms "parent" and "subsidiary" are used throughout to describe related corporate entities for clarity and ease of description, however, for purposes of the Tax Law it is sufficient that the payor and payee entities are related through common ownership (see*,* former Tax Law § § 208 [9] [o] [1] [A]; 208 [9] [o] [1] [B]). The parent/subsidiary distinction is not essential to the statutory or constitutional analysis.

not file a tax return in New York, and the royalty income would therefore not be included on any New York return.

Seeking to capture taxes on IP income, New York enacted former Tax Law § 208 (9) (o) which, among other things, created a process for taxing royalty payments between related entities. The express purpose of that process was to "eliminate tax loopholes concerning royalty payments" (Senate Introducer's Mem in Support, Bill Jacket, L 2003, ch 686 at 9). In furtherance of that purpose, subsection two provided that "[f]or the purpose of computing [ENI] or other applicable taxable basis, a taxpayer must add back royalty payments to a related member during the taxable year to the extent deductible in calculating federal taxable income" (former Tax Law § 208 [9] [o] [2] [A]).

Subparagraph (3) provided:

> "For the purpose of computing entire net income or other taxable basis, a taxpayer shall be allowed to deduct royalty payments directly or indirectly received from a related member during the taxable year to the extent included in the taxpayer's federal taxable income unless such royalty payments would not be required to be added back under subparagraph two of this paragraph or other similar provision in this chapter" (former Tax Law § 208 [9] [o] [3]).

These two provisions, working in concert, imposed a state tax on income used for royalty payments made to a related entity that might otherwise be tax deductible under the former taxing regime, but allowed the receiving entity to deduct those payments when calculating their New York State tax burden, thus avoiding companies including the same income on two different New York corporate tax returns.

The statute was further amended in 2007 to provide three exceptions to the add-back requirement (L 2007, ch 60, § 1, part J, § 4). First, no add back was required if the two companies were included in the same combined tax report[3] filed with New York State, as there was no risk of evasion (former Tax Law § 208 [9] [o] [2] [A]). Similarly, no add back was required if the royalty was ultimately paid to a non-related company for a valid business purpose, as again there was no risk that such payments would be used to avoid taxation (*see id*. § 208 [9] [o] [2] [B] [i]). Finally, an add back was not required if the related member making the royalty payment was organized under the laws of a foreign country with which the United States had a tax treaty ensuring that the royalty payments would be taxed "at a rate at least equal to that imposed by" New York (*id*. § 208 [9] [2] [B] [ii]). If a company was exempted from the add back requirement due to an enumerated statutory exclusion "or other similar provision", it could not take advantage of the royalty tax exclusion contained in subparagraph (3) (former Tax Law § 208 [9] [o] [3]).

---

[3] Under the then-existing law, any company that "own[ed] or control[led] either directly or indirectly substantially all the capital stock of one or more other corporations, or substantially all the capital stock of which is owned or controlled either directly or indirectly by one or more other corporations or by interests which owned or control either directly or indirectly substantially all the capital stock of one or more other corporations" were required to file a combined report covering those corporations if "there are substantial intercorporate transactions among the related corporations" (former Tax Law § 211 [4] [a]). It did not require a "corporation organized under the laws of a country other than the United States" to be included in a combined report (*id.* § 211 [4] [a] [5]).

II.

A. Walt Disney Company v Tax Appeals Tribunal

The Walt Disney Company (Disney) is a multinational, diversified entertainment conglomerate organized under the laws of Delaware. Part of Disney's business includes the development, ownership, and exploitation of IP assets through licensing to subsidiaries both domestically and internationally. Within the United States, Disney and its related entities filed a combined tax return in New York which, as laid out above, is an enumerated exception to the "add back" requirements of former Tax Law § 208 (9) (o) (2). Internationally, Disney's foreign subsidiaries were each party to licensing agreements under which they were permitted to exploit Disney's IP in exchange for royalty payments. The record contains no indication as to whether Disney or its subsidiaries paid any taxes on this income in these foreign jurisdictions.

From 2008 to 2010, Disney paid taxes on the portion of its income allocatable to New York business activity, which represented between 5% and 6% of its total taxable income for the years at issue.[4] During those years Disney received royalty payments totaling $5,440,787,188 from foreign affiliates. For the 2009 and 2010 tax years, Disney deducted royalty payments received from all its foreign subsidiaries from its taxable income. Thereafter it filed an amended tax return for 2008 seeking a refund for foreign

_____

[4] Both Disney and IBM's corporate tax in New York were determined via an allocation formula. Effectively, a corporation's total receipts in New York were divided by their total receipts globally to determine how much business was fairly attributable to New York. A tax was then assessed on only that portion of the corporation's taxable income.

royalty income.  Disney was audited by the Tax Department, which denied its refund request and issued a notice of deficiency in the amount of $3,995,551.

B.  IBM v Tax Appeals Tribunal

International Business Machines Corporation (IBM) is a multinational technology and consulting company organized under the laws of New York.  IBM operates in more than 170 countries worldwide, primarily through locally incorporated subsidiaries.  The subsidiary responsible for international operations is IBM World Trade Corporation (WTC), a Delaware corporation headquartered in New York.  IBM transferred the entirety of its foreign assets to WTC and granted it a non-exclusive license to use certain IP.  The various foreign subsidiaries paid royalties to either IBM or WTC for use and distribution rights to IBM's software, hardware, and for the right to provide services related to IBM products.

From 2007 to 2012, IBM and its US subsidiaries filed combined returns in New York, avoiding the need to add back any royalty payments.  IBM paid the franchise tax on its New York-portion of its taxable income, which was about 5% of its total income for the years at issue.  During that time, IBM received a total of $50,682,369,689 in royalty payments from its foreign subsidiaries.  As with Disney, there is no indication in the record that any foreign taxing authority required any of IBM's foreign subsidiaries to add back the royalty payments made to either IBM or WTC, or any evidence as to any tax liabilities imposed on its subsidiaries.  IBM took deductions for royalty payments received from its subsidiaries for the 2011 and 2012 tax years, and subsequently requested refunds for taxes paid on that income for the years 2007 through 2010.  In response the Tax Department

audited IBM, denied its refund requests, and issued a notice of deficiency for the 2010 to 2012 tax years, as well as interest charges and penalties.

C. Administrative Proceedings

After deficiencies were assessed, both corporations challenged the denial of their royalty tax deductions and the notices of deficiency with the New York State Division of Tax Appeals. In each case, following a hearing, an Administrative Law Judge (ALJ) determined that, under the plain meaning of the statute, the deduction authorized under former Tax Law § 208 (9) (o) (3) only applied where the royalty came from a subsidiary that had been subjected to the add back requirement contained in subsection two. The ALJs opined that the deduction did not discriminate against out-of-state interests as it was only permitted after a related company had already paid an in-state tax. Thus, the ALJs denied the petitions and sustained the notices of deficiency. The Tax Appeals Tribunal (Tribunal) subsequently affirmed both decisions.

Appellants challenged these determinations by commencing CPLR article 78 proceedings in the Appellate Division. The Appellate Division affirmed the determinations and dismissed the petitions, holding in separate decisions that the plain meaning of the statute supported the Tribunal's decision and that there was no differential treatment between in-state and out-of-state commerce (*see Matter of Walt Disney Co. & Consol. Subsidiaries v Tax Appeals Trib. of the State of N.Y.*, 210 AD3d 86, 89-92 [3d Dept 2022]; *Matter of International Bus. Machs. Corp. & Combined Affiliates v Tax Appeals Trib. of the State of N.Y.*, 214 AD3d 1125, 1126 [3d Dept 2023]). Appellants appealed to this Court as of right pursuant to CPLR 5601 (b) (1).

III.

Contrary to appellants' contentions, the Tribunal properly interpreted the statute. This Court's "cardinal function in interpreting any statute should be to attempt to effectuate the intent of the Legislature, and where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used" (*Matter of 1605 Book Ctr. v Tax Appeals Trib. of State of N.Y.*, 83 NY2d 240, 244 [1994], *quoting Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669, 674-675 [1988]). The plain meaning of the statutory language is clear: "[A] taxpayer shall be allowed to deduct royalty payments directly or indirectly received from a related member during the taxable year to the extent included in the taxpayer's federal taxable income unless such royalty payments would not be required to be added back under subparagraph two of this *paragraph or other similar provision in this chapter*" (former Tax Law § 208 [9] [o] [3] [emphasis added]). By its plain terms, the statute allows parent taxpayers to deduct royalty income only if that money had already been included on a New York tax return through an add back to the subsidiary's income.

Although the statute provides that a deduction will not be granted if one of the statutory exceptions to the add back requirement applies, it goes on to state that the deduction will not be permitted if an add back is not required under a "similar provision" in the chapter. Given that the operative language applies only to "corporations subject to tax under this article," i.e., corporations subject to tax in New York, the deduction was clearly only available to corporations receiving royalties from related entities who were

subject to the add back, not those that would be subject to the addback if they were they subject to New York taxes, as appellants suggest.

Even if the statute were not clear on its face, which it is, we consider the objectives sought to be achieved by the legislature (*see Matter of Petterson v Daystrom Corp.*, 17 NY2d 32, 38 [1966]). Notwithstanding that ambiguities in tax statutes should "be construed in favor of the taxpayer and against the taxing authority" (*Quotron Sys. v Gallman*, 39 NY2d 428, 431 [1976]), our main goal is to "give a correct, fair and practical construction that properly accords with the discernible intention and expression of the Legislature" (*1605 Book Ctr.* 83 NY2d at 244-245). In enacting the deduction and add back scheme at issue here, the legislature was attempting to close a loophole by which international corporate groups avoided paying state taxes on royalty payments between related members of the corporate group (*see* Senate Introducer's Mem in Support at 5, Bill Jacket, L 2003, ch 686 at 9).

Appellants' proposed interpretation of the law would not accomplish this goal, and in fact would result in the opposite outcome. Corporate families with subsidiaries out of state would be permitted to take a tax deduction without first paying a New York tax on the royalty money. By simply domiciling their subsidiaries outside New York, corporate groups would be able to perpetuate the very same tax loophole the challenged legislation seeks to avoid. Although counsel for Disney suggests that the legislature actually intended this incongruous result, neither appellant points to any authority supporting this interpretation. As both the plain language and the explicit legislative purpose behind the statute support the Tribunal's interpretation, we see no reason to disturb that determination.

IV.

Appellants argue that this construction of former Tax Law § 208 (9) (o) facially violates the dormant Commerce Clause.  They must therefore "surmount the presumption of constitutionality accorded to legislative enactments by proof beyond a reasonable doubt" (*Matter of Moran Towing Corp. v Urbach*, 99 NY2d 443, 448 [2003] [internal quotation marks omitted]).  To do so, they bear "the substantial burden of demonstrating that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment.  In other words, [appellants] must establish that no set of circumstances exists under which the [law] would be valid" (*id.* [internal quotation marks and citation omitted]).  The Commerce Clause of the United States Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes" (US Const, art I, § 8 [3]).  Although "phrased as a grant of regulatory power to Congress," the Commerce Clause "has also been interpreted as effecting a 'negative aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce' " (*American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin.*, 84 NY2d 31, 34 [1994] [internal quotation marks omitted], quoting *Oregon Waste Systems, Inc. v Department of Environmental Quality of Ore.*, 511 US 93, 98 [1994]), including "prohibiting certain state taxation even when Congress has failed to legislate on the subject" (*Oklahoma Tax Commn v Jefferson Lines, Inc.*, 514 US 175, 179 [1995]).  Indeed, the dormant Commerce Clause precludes states from "discriminating between transactions on the basis of some interstate element" (*Boston Stock Exchange v State Tax Commn*, 429 US 318, 332 n 12 [1977]), meaning that

states "may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the state" (*Armco Inc. v Hardesty*, 467 US 638, 642 [1984]) or "impose a tax which . . . provid[es] a direct commercial advantage to local business, or . . . subject[s] interstate commerce to the burden of 'multiple taxation' " (*Northwestern States Portland Cement Co. v Minnesota*, 358 US 450, 458 [1959]).

Generally, to withstand a challenge under the so-called dormant Commerce Clause, a state tax (1) must be "applied to an activity with a substantial nexus with the taxing State," (2) must be "fairly apportioned," meaning internally and externally consistent, (3) may not discriminate against cross-border commerce and (4) must be "fairly related to the services provided by the State" (*Complete Auto Transit, Inc. v Brady*, 430 US 274, 279 [1977]; *see e.g. Westinghouse Elec. Corp. v Tully*, 466 US 388, 402 [1984]; *Matter of Zelinsky v Tax Appeals Trib. of State of N.Y.*, 1 NY3d 85, 90 [2003], *cert denied* 541 US 1009 [2004]). With regard to foreign commerce, the United States Supreme Court has identified two additional prongs: "first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from speaking with one voice when regulating commercial relations with foreign governments" (*Japan Line, Ltd. v County of Los Angeles*, 441 US 434, 451 [1979] [internal quotation marks omitted]). "[A] proper [dormant Commerce Clause] analysis must take the whole scheme of taxation into account" (*Halliburton Oil Well Cementing Co. v Reily*, 373 US 64, 69 [1963]). Appellants' narrow argument is that former Tax Law § 208 (9) (o) fails the discrimination prong, because it facially discriminates

against out-of-state commerce, and does not pass the internal consistency test. Appellants have failed to meet their high burden to demonstrate such discrimination.

A.

With respect to the discrimination prong appellants have failed to show that the subject tax scheme is facially discriminatory against out-of-state commerce, that it in any way mandated "economic protectionism", or that it was a "regulatory measure[] designed to benefit in-state economic interests by burdening out-of-state competitors" (*National Pork Producers Council v Ross*, 548 US 356, 370 [2023]). At the corporate group level, Tax Law former § 208 (9) (o) treated groups with related members who did not pay taxes in New York the same as those with related members who did. The scheme (1) required payors of dividends to add back to their taxable income royalty payments to related corporate members that were deductible under federal law and (2) allowed recipients of royalty payments to deduct them from their taxable income unless the payor was not required to add them back to their taxable income. The result was a scheme where, if the payor was a New York taxpayer and no exceptions applied, the income used to make royalty payments only had to be included in the payor's taxable income. When a non-New York taxpayer made royalty payments to a New York taxpayer, that income had to be included in the payee's taxable income. In each case, the income only had to be included on a New York tax return once, resulting in a neutral economic impact on the corporate group as a whole. As is astutely noted by the concurrence, Tax Law former § 208 (9) (o) is not discriminatory inasmuch as it "is not a measure that imposes benefits or burdens

depending upon where a business is located, where goods are produced, or where payments are made" (concurring op at 2). Rather, "it is fundamentally a tax filing requirement (*id*.).

This case is distinguishable from cases in which the United States Supreme Court has found facial discrimination in a taxation scheme. In *Kraft*, the Court invalidated a tax scheme that allowed Iowa corporations to take a deduction from taxable income for dividends received from subsidiaries incorporated in Iowa, but not those incorporated elsewhere (*see* 505 US at 77). Unlike here, the *Iowa* scheme contained no add-back requirement. This meant that if the subsidiary paying the dividend was in Iowa, the corporate group faced no tax liability for the dividend, whereas if the subsidiary was incorporated abroad, the entire dividend was treated as income and taxable (*see id.*at 77-78). Similarly, in *Westinghouse*, the Supreme Court found a violation where a tax credit for a corporate parent increased when its subsidiary shipped goods from within New York and decreased when the subsidiary shipped goods outside the state (*see* 466 US at 400-01). By predicating the tax credit on the extent of a subsidiary's in-state export activities, it created a direct incentive to move business into New York, and therefore violated the dormant Commerce Clause by imposing a discriminatory burden on other states' commerce.

Helpful to our analysis is the New Hampshire Supreme Court's consideration of a virtually identical taxing scheme in *General Elec. Co., Inc. v Commissioner, N. H. Dept. of Revenue Admin.* (154 NH 457, 914 A2d 246 [2006], *cert denied* 552 US 989 [2007]). That Court rejected a constitutional challenge to New Hampshire's similar tax scheme because, viewed as a whole, the tax did not discriminate against commerce but rather

sought to tax each corporate group one time. This "taxing symmetry" ensured that corporations were only paying state tax on subsidiary income once and, as such, there was no differential treatment between companies that received the deduction and those that did not. So too here, there is no differential treatment on the corporate group level and the challenged taxing scheme is thus not facially discriminatory.

B.

Nor does the challenged scheme violate the United States Supreme Court's internal consistency test, which instructs courts to assume the challenged tax scheme applies in every jurisdiction in order to determine if such application would inherently result in impermissible interference with the flow of commerce (*see Container Corp. of America v Franchise Tax Bd.*, 463 US 159, 169 [1983]).

> "By hypothetically assuming that every State has the same tax structure, the internal consistency test allows courts to isolate the effect of a defendant State's tax scheme. This is a virtue of the test because it allows courts to distinguish between (1) tax schemes that inherently discriminate against interstate commerce without regard to the tax policies of other States, and (2) tax schemes that create disparate incentives to engage in interstate commerce (and sometimes result in double taxation) only as a result of the interaction of two different but nondiscriminatory and internally consistent schemes. The first category of taxes is typically unconstitutional; the second is not" (*Comptroller of Treasury of Md. v Wynne*, 575 US 542, 562 [2015] [citations omitted]).

The tax here falls within the latter *Wynne* category. Even if every other jurisdiction applied the same tax scheme found in former Tax Law § 208 (9) (o), there would be no impermissible burden on interstate commerce. Subsidiaries that did not pay taxes in New York would be subject to a hypothetical foreign add-back requirement when making

royalty payments and their New York taxpayer corporate parents would be entitled to a hypothetical deduction for the portion of taxes apportioned to that jurisdiction, but not a deduction in New York. In this scenario, because the intellectual property is being used in the foreign country, that income would not constitute New York business receipts, and therefore would not be allocated to New York for purposes of calculating the parent company's BAP. In other words, although the income would be added to the parent's total taxable income, it would result in a lower percentage of that total income subject to New York corporate tax.[5]

Indeed, it appears that appellants' true objection is to the system of income apportionment itself, and that their objection to "double taxation" here is more properly viewed as a repackaged challenge to that method of taxation. They argue that because royalty payments from foreign subsidiaries were taxed by New York (in that they were added to the total taxable income for the corporate parent), the corporate group would suffer a "double tax" if a foreign jurisdiction also taxed the payment through an add back. But the central premise of this argument is flawed. Because the internal consistency test requires us to evaluate the "tax scheme as a whole," we must also take into account New York's aforementioned system of calculating the portion of total income taxable in New

---

[5] The reverse, of course, would be true for calculating a parent's franchise tax in a foreign jurisdiction. Any royalty payments received from New York subsidiaries would not be deductible from total income when calculating the foreign tax burden as the subsidiary would not have added back its income in the foreign jurisdiction. However, the addition of such income from IP used in New York would also necessarily reduce the corporation's income attributable to that jurisdiction.

York.  Under that system, the addition of foreign income to a corporate parent's total income is not equivalent to subjecting it to corporate taxation in New York.

In the realm of internal consistency, because of the system of allocation, relocating intellectual property to New York could increase, decrease, or have no effect on a company' total taxable income depending on factors entirely independent of the add back scheme. Rather, whether a corporate group faces a greater or lesser tax burden as a result of receiving foreign royalty payments will depend on the amount of such payments received as well as the percentage of their total income attributable to such receipts.  "[T]he appropriate measure of discrimination is comparison of similar circumstances, and the circumstances chosen to illustrate [the discrimination] seem ordinary rather than extraordinary and likely rather than unlikely" (*Appeal of Morton Thiokol, inc.*, 254 Kan. 23, 37 [Kansas 1993]).  Appellants have failed to show that, under the internal consistency test, the challenged tax necessarily discriminates against interstate commerce in its ordinary application.  It is simply not sufficient to show that sometimes, in some situations, the conflicting laws may result in a greater tax (*see Moran Towing Corp*, 99 NY2d at 448).

On the contrary, it is well settled that, while not perfect, the apportionment of taxes does not violate the Commerce Clause (*see Shell Oil Co.  v Iowa Dept.  of Revenue*, 488 US 19, 30 [1988]; *Matter of Disney Enters. Inc. v Tax Appeals Trib. of State of N.Y.*, 10 NY3d 392, 400-401 [2008]; *Brady v State of New York*, 80 NY2d 596, 603 [1992]).  "[W]hen apportioning a [corporate] group's in-state taxable income, a state may look beyond its borders and take into account income of companies not subject to its jurisdiction. . .  In doing so, the state is not deemed to have taxed that income but instead to have used

it to determine the tax base fairly attributable to the group as a whole" (*Matter of Disney Enters.*, 10 NY3d at 400 [citations omitted]).  Regardless of what tax may be applied to royalty payments in a foreign jurisdiction, the mere inclusion of such payments to a parent company's total taxable income does not result in an unconstitutional burden on interstate commerce as with each additional foreign dollar added, the portion of that company's income attributable to New York State will decrease.  And "although the total tax assessed in the end may not be exactly equal. . .   the state's taxation methods need not apportion income perfectly; the Federal Constitution does not require mathematical exactitude, only a rough approximation" (*General Electric Co.*, 154 NH at 470 [internal quotation marks and brackets omitted]; *accord Illinois Central R. Co. v Minnesota*, 309 US 157, 161 [1940]).

As New York's tax scheme would not result in duplicative taxation in all (or even most) situations, it is not inherently discriminatory.  To the extent that duplicative taxation may sometimes occur, it is the incidental result of "the interaction of two different but nondiscriminatory and internally consistent schemes" (*Wynne*, 575 US at 562).

Accordingly, in each case, the judgment of the Appellate Division should be affirmed, with costs.

WILSON, Chief Judge (concurring):

Disney and IBM, petitioners here, have advanced two arguments: first, that former Tax Law section 208 (9) (o) (3) should not be interpreted as the Department of Taxation and Finance has interpreted it; and second, that under the Department's interpretation, the statute violated the Commerce Clause of the United States Constitution. I agree with the majority's (and the Department's) reading of the statute. I also agree that the statute does not violate the Commerce Clause, though for different reasons than those relied on by the majority.

The key to explaining why former Tax Law section 208 (9) (o) (3) does not offend the dormant Commerce Clause is to understand it for what it is and what it is not. It is not a measure that imposes benefits or burdens depending upon where a business is located, where goods are produced, or where payments are made. Instead, it is fundamentally a tax filing provision. The availability of the deduction depends on whether the subsidiary is a "New York taxpayer," not on whether the royalty payment or any aspect of the corporate group's business crosses jurisdictional lines (*Walt Disney Co. and Consol. Subsidiaries v Tax Appeals Trib*., 210 AD3d 86, 90 [3d Dept 2022]). A transaction between two New York taxpayers, which petitioners label an "intrastate" transaction, may be between a French corporation and a Chinese subsidiary, so long as both related members file taxes in New York. A transaction between a New York taxpayer and a non-New York taxpayer, which petitioners label an "interstate" transaction, may be between two Delaware entities, only one of which files taxes in New York.

As these examples illustrate, because former Tax Law section 208 (9) (o) (3) is purely a tax filing provision, it does not necessarily tax "a transaction or incident more

heavily when it crosses state lines than when it occurs entirely within the State" (*Armco Inc. v Hardesty*, 467 US 638, 642 [1984]). Rather, it creates complex second-order incentives that sometimes favor and sometimes disfavor interstate business operations. By conflating the requirement that the subsidiary file tax in New York with a requirement that the subsidiary be incorporated in New York or make royalty payments here, petitioners fail to properly account for those incentives. When the statute is understood for what it is, "[n]either record evidence nor abstract logic makes clear whether the overall effect…would be to increase or to reduce existing financial disincentives to interstate travel" (*Comptroller of Treasury of Maryland v Wynne*, 575 US 542, 563 n 7 [2016] [citation omitted]). Therefore, petitioners have not shown that the statute violates the dormant Commerce Clause.

## I.

Former Tax Law section 208 (9) (o) (3) states that:

> "For the purpose of computing entire net income or other taxable basis, a taxpayer shall be allowed to deduct royalty payments directly or indirectly received from a related member during the taxable year to the extent included in the taxpayer's federal taxable income unless such royalty payments would not be required to be added back under subparagraph two of this paragraph or other similar provision in this chapter."

A royalty payment is "required to be added back under subparagraph two of this paragraph or other similar provision of this chapter" only if the payor is a New York taxpayer. If a payor corporation does not file a New York corporation franchise tax return, it is not required to do anything under subparagraph two or any provision of the chapter

governing New York corporation franchise tax. And because such a payor would not be required to take the add-back, the recipient may not take the deduction.

Setting constitutional concerns aside, I agree with the majority that this is the most straightforward interpretation of the statute. The statutory scheme was enacted to address a tax loophole when royalties were paid by a NY-taxpaying parent to a subsidiary[1] in another jurisdiction which did not tax royalty income, thereby insulating the income from taxation. However, the reading advanced by petitioners would create a concomitant loophole when royalties are paid by a non-NY taxpaying subsidiary in a jurisdiction with no add-back to a NY-taxpaying parent. This is not what the legislature intended. Indeed, petitioners do not claim that the legislature intended to create the exemption conferred by the reading they offer.

Instead, they argue that the Tax Department's interpretation would facially discriminate against interstate commerce in violation of the dormant Commerce Clause of the United States Constitution (US Const, art I, § 8, cl 3). Therefore, petitioners contend that we should construe former Tax Law section 208 (9) (o) (3) as they propose, to avoid the proffered constitutional infirmity (*see Overstock.com, Inc. v New York State Dept. of Taxation and Fin.*, 20 NY3d 586, 593 [2013]; *H. Kauffman & Sons Saddlery Co. v Miller*, 298 NY 38, 44 [1948]). As explained below, I conclude that former Tax Law section 208 (9) (o) (3) does not violate the dormant Commerce Clause, and therefore I have no basis to

---

[1] Although I use "parent" and "subsidiary" because the parties here fit these labels, nothing turns on them. The scheme of deductions and addbacks in former Tax Law § 208 (9) (o) covered all "related members" without regard to parent or subsidiary status.

construe the statute other than the way in which it plainly reads, just as the majority and the Department have read it.

## II.

At issue in these appeals are royalty payments made by affiliates to their ultimate corporate parents for use of intellectual property owned by the parent. As the Tax Department has consistently maintained and the Third Department reaffirmed, the availability of the deduction for such payments turns on whether the royalty payor (affiliate) is a "New York taxpayer[]" (*Walt Disney Co.*, 210 AD3d at 90). If the royalty payor files a New York corporation franchise tax return (regardless of where the payor is located), it is required to take the add-back and therefore the deduction becomes available to the recipient (parent). If the royalty payor does not file such a return, it is not required to take the add-back and therefore no deduction is available to the recipient.

Although that rule is quite clear, petitioners have misapprehended it. A "New York taxpayer" is not the same as a corporation domiciled in New York, nor is it the same as a company that receives royalty payments in New York or does business in New York. It is merely a corporation that files a tax return in New York.

Thus, for a parent corporation to receive the deduction, the subsidiary need only file a New York tax return. Because petitioners have brought a facial challenge, they bear the burden to "establish that no set of circumstances exists under which the Act would be valid" (*United States v Salerno*, 481 US 739, 745 [1987]). However, the record here fails to show that IBM and Disney could not have obtained the deduction they seek, because the record

does not contain any indication of whether their foreign payor subsidiaries filed or attempted to file New York tax returns. Petitioners have never even asserted that their foreign payor subsidiaries could not have filed tax returns in New York, or that some untoward consequence would befall them if they had done so. If their subsidiaries had taken the add-back on New York tax returns, each parent could have claimed the deduction without changing anything about the corporate group's business operations. Although almost all would agree that filing tax returns is burdensome, it is not the sort of burden that violates the Commerce Clause—and no party contends that it would.

The statutory provisions discussed by petitioners do not suggest that the payor subsidiaries were barred from filing their own New York tax returns. Even were we to examine provisions never mentioned by petitioners, the issue is not obviously resolved. The statute governing corporate taxation does not speak in terms of which corporations are permitted to file tax returns, but rather in terms of which corporations are required to do so (*see* former Tax Law § 209). In the most general possible terms, a corporation is required to pay franchise tax if it is "doing business" in New York state (*see id.* [1] [requiring a corporation to file a tax return "[f]or the privilege of exercising its corporate franchise, or of doing business, or of employing capital, or of owning or leasing property in this state in a corporate or organized capacity, or of maintaining an office in this state"]); *Wurlitzer Co. v State Tax Commn.*, 35 NY2d 100, 104 [1974]). The record at least implies that Disney and IBM's foreign payor subsidiaries did not do business in New York during the relevant period, and therefore were not required to file a corporate tax return.

However, that does not mean that they were not *allowed* to file such a return. Whether a company that does no business in New York could file a corporate franchise tax return in order to achieve a tax deduction for a related member is a novel question, but nothing in the record suggests that any payor affiliate of Disney or IBM ever sought to do so or even inquired about doing so as a way to permit the corporate parent to take the deduction. Although we can imagine arguments against a subsidiary's ability to claim the add-back on a New York franchise tax return,[2] petitioners have not raised any such arguments or shown on this record that former Tax Law section 208 (9) (o) (3) created anything more than an administrative burden.

For that reason, both appeals fail. If the payor subsidiaries could have filed New York corporate tax returns, which would have required those subsidiaries to "add back royalty payments to a related member" (former Tax Law § 208 [9] [o] [2]), petitioners have no case, because the parents could have then taken the deduction on their tax returns and would have been treated exactly the same as a New York parent corporation with a New York subsidiary. Because petitioners have not even attempted to demonstrate that they could not have obtained the deduction they seek by merely having their affiliated foreign

---

[2] Former Tax Law § 208 (3) defines "taxpayer as "any corporation subject to tax under this article." Tax Law § 209 at some points uses "subject to tax" as a synonym for "required to pay tax" (*see* former Tax Law § 209 [4] [certain corporations liable to tax under other sections are not "subject to tax under this article"]). It is possible that a corporation that is not "subject to tax" would not be a "New York taxpayer" able to claim the royalty addback under former Tax Law § 208 (9) (o) (3).

payors file a New York tax return, there is no basis on which to hold former Tax Law

section 208 (9) (o) unconstitutional.


                                    III.

For the sake of argument, though, let us assume that the Department would not have

allowed Disney and IBM's foreign payor subsidiaries to file New York tax returns even if

they had tried, presumably because they do not do business here. On that assumption,

Disney and IBM's Commerce Clause arguments still fail.

Disney and IBM have often conflated the "New York taxpayer" requirement with

a requirement that the subsidiary be domiciled here or receive royalty payments here.

However, there is plainly no requirement that a corporation must be domiciled in New

York or make or receive royalty payments from or in New York to be required to file a

New York corporate tax return. A corporation that transacts business in New York is

required to file a New York tax return, even if it is not incorporated in New York and its

business has nothing to do with royalty payments.

Notably, a corporation may file a franchise tax return in many jurisdictions, even if

it is incorporated in or allocates royalty payments to relatively few of those jurisdictions.[3]

When a corporation is taxed in multiple jurisdictions, its net income is allocated to each

jurisdiction for tax purposes depending on the portion of taxable value created in that state

(*see* former Tax Law § 210 [3]; *see generally Oklahoma Tax Commn. v Jefferson Lines,*

---

[3] The parties agree that at the relevant time, receipts from royalty payments for intellectual property were allocated to the jurisdiction in which the intellectual property was used.

*Inc.*, 514 US 175, 186 [1995] [describing the constitutional requirement that no state tax more than its fair share of interstate commerce and discussing possible methods of apportionment]).

When we remember that the deduction at issue is based on the location of tax filings, not the location of incorporation or royalty payment, Disney and IBM's characterization of "intrastate" and "interstate" transactions falls apart. Disney and IBM often refer to New York related members as if they operate solely in New York and receive royalty payments in New York.[4] But a "New York taxpayer" for purposes of this deduction is simply a corporation, wherever located and receiving payments, that does sufficient business in New York to require it to file a franchise tax return. A payment from a "New York" subsidiary to a "New York" parent, which the petitioners describe as "in-state" or "intrastate," is simply a royalty payment between two companies that both file returns in New York, regardless of where the companies are based and where the intellectual property and royalty payments are used. Although petitioners' definition of "intrastate" does cover payments between New York related members (as long as they both pay New York tax), it also covers a royalty payment from France to China as long as it is between two New York taxpayers. Conversely, a payment from a "Foreign" payor to a "New York" recipient, which petitioners describe as "interstate," is a payment from a company that does not pay tax in

---

[4] At certain points, Disney acknowledges that the tax is not related to the transaction but to the subsidiary's presence in the state. However, Disney also conflates this understanding with understandings of the tax based on the location of payments or of incorporation, and significant portions of its argument rely on that conflation. To the extent that Disney argues that merely distinguishing between New York taxpayers and other subsidiaries violates the dormant Commerce Clause, I address that argument in Part V *infra*.

New York to a company that does, regardless of the location of the companies and where the payments are made. Petitioners' definition of "interstate" covers a transaction between a Delaware payor and a Delaware recipient, so long as only the former pays corporate franchise tax in New York.

An example makes the error in petitioners' definition transparent. Petitioners suggest that the availability of the deduction turns on whether the corporate group participates in interstate or intrastate commerce. But consider a situation in which Disney, a Delaware corporation, receives a royalty payment from Magical Cruise Co. Ltd., which is incorporated in the United Kingdom. Disney files a corporate franchise tax return in New York, but Magical Cruise does not. For Disney to take the royalty deduction, Magical Cruise must file a tax return in New York. That is the only requirement. If Magical Cruise begins doing business, totally unrelated to any royalties, that requires it to file a corporate franchise tax return in New York, Disney may take the deduction. But if Magical Cruise reincorporates in Delaware and moves all its business there, Disney still may not take the deduction, because Magical Cruise still does not file a New York tax return. It is irrelevant that the entire royalty transaction is now intrastate (Delaware to Delaware). Conversely, if Magical Cruise files a New York tax return, it is irrelevant to Disney's deduction status that the royalty payment is still transmitted from the United Kingdom to Delaware. The issue is only whether the payor is a "New York taxpayer."

This is not a mistake or even an unintended consequence of the Department's position, but the straightforward result of the Department's view of the statutory policy. The Department's view is that the legislative intent of the deduction was to counteract

double taxation that the legislature had caused via the add-back requirement in Tax Law former section 208 (9) (o) (2), and that it was not intended to be available in other situations. As to that proposition, the majority and I are completely in agreement. This is entirely consistent with the view that the deduction would be available when the add-back provision is invoked and unavailable when it is not, regardless of the location of the payments or corporations. There is no reason the Department should object to Delaware-based Disney taking a deduction on a royalty payment from a United Kingdom subsidiary, so long as that subsidiary adds back the payment under section 208 (9) (o) (2).

To summarize, the Department's interpretation of former Tax Law section 208 (9) (o) (3) does not disallow the deduction when a royalty payment is interstate. Rather (still holding to the untested assumption that a corporation that does no business in New York could not file a New York tax return), it disallows a deduction for royalty payments from a corporation that does not do business in New York, regardless of the locations of the payor or recipient. The question is whether that violates the dormant Commerce Clause.


IV.

Petitioners allege that the Department's interpretation facially violates the dormant Commerce Clause, meaning that it "inherently" discriminates against interstate commerce (*Wynne*, 575 US at 562) and is "unconstitutional in all applications" (*City of Los Angeles, Calif. v Patel*, 576 US 409, 418 [2015]).

Under the *Complete Auto* test, a tax is constitutional if it:

(1)     "is applied to an activity with a substantial nexus with the taxing State";

(2)    "is fairly apportioned";

(3)    "does not discriminate against interstate commerce";

(4)    "is fairly related to the services provided by the State" (*Complete Auto Tr., Inc. v Brady*, 430 US 274, 279 [1977]).

Here, the issue is whether the scheme of royalty deductions and add-backs set out in former Tax Law section 208 (9) (o) discriminates against interstate commerce. *Comptroller of Treasury of Maryland v Wynne*, the most recent Supreme Court case to address this issue, suggests that whether a scheme of taxation discriminates against interstate commerce depends on application of the internal consistency test (*see* 575 US at 562).

The internal consistency test "looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate" (*id.*, quoting *Jefferson Lines,* 514 US at 185).  A tax that fails the test is "typically unconstitutional;" a tax that passes is typically not (*Wynne*, 575 US at 562-563). A primary contention of petitioners, especially petitioner IBM, is that former Tax Law section 208 (9) (o) is unconstitutional because it violates the internal consistency test.

The internal consistency test requires the hypothetical application of New York's tax scheme to every jurisdiction.[5] In that hypothetical, every jurisdiction would follow the related member add-back provision in former section 208 (9) (o) (2). Thus the royalty-

---

[5] Although *Wynne* refers to the test in the context of interstate commerce, it also traces the use of test to *Container Corp. of Am. v Franchise Tax Bd.*, 463 US 159, 169 [1983], which dealt with foreign commerce. Petitioners contend that the internal consistency test applies to international commerce and the Tax Department does not dispute that proposition. Therefore, we assume that the internal consistency test applies here.

paying subsidiary would have the payment added back to its income no matter where it files tax,[6] and will always be taxed on that money. Therefore, whenever the royalty recipient does not receive the deduction and is required to pay tax on the same money, there would be some level of multiple taxation. The multiple taxation would be avoided when the payor files in the same jurisdiction as the recipient. Just as New York permits an income deduction when the royalty payor files in New York, Delaware would permit an income deduction when the payor files in Delaware, and the United Kingdom would permit an income deduction which the payor files in the United Kingdom. Under that regime, the incentive is for the royalty payor to file a corporate franchise return in every jurisdiction where the recipient does so.

The internal consistency text asks whether application of that regime "would place interstate commerce at a disadvantage as compared with commerce intrastate" (*id.* at 562, quoting *Jefferson Lines, Inc.,* 514 US at 185). Disney and IBM argue that it would. If a New York company receives a royalty payment from a New York subsidiary, both taxpayers will file in the same jurisdiction and the money will only be taxed once. However, if a New York company receives a royalty payment from a foreign subsidiary, the foreign subsidiary will be required to add the money back, the New York company will not receive the deduction, and the money will be taxed twice.

---

[6] The payor would not receive the add-back if the transaction implicated the exclusions in former Tax Law § 208 (9) (o) (2), but the parties agree that these exclusions are not relevant here.

In analyzing that argument, we must first remember that what petitioners describe as a "New York" company is merely a company that does business in New York. For example, petitioner Disney is a Delaware corporation—even if the tax regime incentivizes Disney to do business in New York, this seems to favor interstate commerce, not intrastate commerce. Similarly, it is not true that Disney is necessarily disincentivized to receive royalty payments from foreign corporations—if the foreign corporation pays New York tax, such a payment is favored.

More directly, because the tax is not on interstate transactions but rather relates to the location of filing, it is not difficult to find situations where a corporation would benefit from receiving a foreign royalty payment rather than an intrastate one. For example, consider a New York corporation that does business in both New York and the United Kingdom, with 90% of its receipts in the United Kingdom and 10% in New York.[7] The corporation has a subsidiary solely operating in New York and a subsidiary solely operating in the United Kingdom. If the corporation receives a royalty payment from the subsidiary in New York, it will be able to take the royalty deduction in New York but will not be able to take the deduction in the United Kingdom. If the corporation receives a royalty payment from the subsidiary in the United Kingdom, it will be able to take the deduction in the United Kingdom but not New York.

Faced with that choice, the corporation is better off receiving the royalty payment from (and taking the deduction in) the United Kingdom, because it has a higher allocation

---

[7] The allocation of net income to different jurisdictions in which a corporation does business is based on receipts, not profit (*see* former Tax Law § 210 [3] [a]).

percentage in that jurisdiction. After the deduction is taken, the net income of the corporation is multiplied by the allocation percentage (which at the time in New York was based on receipts) to determine taxable income in that jurisdiction. In this example, the allocation percentage would be 90% in the United Kingdom and 10% in New York. Therefore, if the deduction is taken in the United Kingdom it will be multiplied by 90%, but if it is taken in New York it will only be multiplied by 10%.[8] In general, whenever a business has a higher allocation percentage in a foreign jurisdiction than in New York, it will be preferable for the taxpayer to deal with a corporation that pays tax in that jurisdiction. Therefore, under the internal consistency test, the taxation scheme will tend to favor payments from a subsidiary located in a jurisdiction where the recipient's allocation percentage is the greatest—which could either be an interstate or an intrastate transaction. Because under some circumstances the tax favors foreign commerce, petitioners cannot show that it facially discriminates against foreign commerce (*see Patel*, 576 US at 418; *Wynne* 575 US at 563 n 7).

─────────────────────

[8] For a numerical example, we can imagine that both jurisdictions calculate the net income of the corporation to be $500. The United Kingdom will tax $450 and New York will tax $50.

If the corporation is receiving a royalty of $100 from a subsidiary, it can get a deduction of $100 in the jurisdiction where that subsidiary files tax. If it receives the royalty from a subsidiary filing in the United Kingdom, the United Kingdom will calculate the corporation's net income at $400 and tax $360. New York will still calculate net income at $500 and tax $50. The total taxable income in both jurisdictions is $360 + $50, or $410.

If it instead receives the royalty from a subsidiary filing in New York, New York will calculate the corporation's net income at $400 and tax $40. The United Kingdom will still calculate the corporation's net income at $500 and tax $450. The total taxable income in both jurisdictions is $450 + $40, or $490.

Petitioners fail to address that issue, which is especially concerning because the scheme of taxation plausibly favors foreign commerce even as applied to them. IBM urged at argument that the correct application of the internal consistency test holds the plaintiffs constant and changes only the taxation schemes of the relevant jurisdictions (*see* Hellerstein and Hellerstein, State Taxation § 4.16 [1] [c]; *In re Alternative Minimum Tax Refund Cases*, 546 NW2d 285, 290 [Minn 1996]). But it appears that if we do so, Disney and IBM would benefit from engaging in additional foreign or interstate commerce, not additional intrastate commerce.

IBM is a New York corporation with numerous subsidiaries throughout the United States and foreign jurisdictions. During the years in question, about 5% of IBM's net income was allocated to New York. That means that 95% of IBM's net income was allocated to other jurisdictions. Essentially the same facts are true of Disney.[9]

If there is any jurisdiction where IBM has a higher allocation percentage than in New York, IBM would benefit from receiving the royalty payment from that jurisdiction rather than from New York. Given that IBM's income is only allocated 5% to New York, this could plausibly be the case. For example, if 10% of IBM's income is allocated to Canada, under internal consistency IBM would be tax-advantaged by receiving a royalty payment from a Canadian taxpayer, in which case its deduction is multiplied by 10%, rather than receiving a payment from an in-state New York taxpayer and having the deduction

---

[9] Disney is a Delaware corporation, but assuming internal consistency the exact same analysis can be repeated with regard to Delaware. Disney's allocation percentage in New York during the years in question was also approximately 5%.

multiplied by 5%. Therefore, for a corporation like IBM for which New York is only one of many relevant tax jurisdictions, it is not at all clear that intrastate royalty payments are tax-advantaged.

Taking this line of reasoning further, the internal consistency test does not require that we assume each subsidiary does business in only a single jurisdiction. IBM would be best off if it received the payment from a subsidiary that did business not only in Canada, but also in New York and all other jurisdictions where it does business, because then it would benefit from a deduction in every place it is subject to an add-back. That even higher level of interstate business would advantage the corporation even further.

In short, although it is theoretically possible (again, assuming under internal consistency that every jurisdiction requires an add-back) that the former tax regime could create double taxation despite the clear legislative intent to avoid this, for petitioners and those similarly situated any double taxation would operate as a penalty for corporate groups that do not conduct sufficient interstate business, rather than a penalty for those who conduct too much. This is demonstrated by the fact that the action which petitioners portray as tax-advantaged, receiving all royalties from related members within New York, would not in fact eliminate double taxation for them assuming internal consistency. Rather, petitioners would need to ensure that the related members file franchise tax returns in each of the numerous jurisdictions in which petitioners do business. I do not read any of the Supreme Court's Commerce Clause jurisprudence to suggest that a state may not enact a law that tends to favor interstate or foreign commerce over intrastate.

I do not suggest that the short-lived scheme of taxation created by former Tax Law section 208 (9) (o) (3) is necessarily fair or sensible—the risk of double taxation in jurisdictions where payors (for whatever reason) do not file is unnecessary and could have been easily been eliminated, for example by a credit for taxes paid in the foreign jurisdiction. However, given that "[n]either record evidence nor abstract logic makes clear whether the overall effect of such a system would be to increase or to reduce existing financial disincentives to interstate" business transactions," it does not violate the internal consistency test (*Wynne*, 575 US at 563 n 7 [citation omitted]).


V.

Disney also argues, independently of the internal consistency test, that former Tax Law section 208 (9) (o) is unconstitutional because it premises a tax deduction on a geographic determinant. However, the presence of a geographic determinant is not sufficient to show that a tax facially discriminates against interstate commerce. For example, a tax that explicitly states that intrastate activity will be taxed more heavily than interstate activity is premised on a geographic determinant. However, it does not "place burdens on the flow of commerce across [] borders that commerce wholly within those borders would not bear"—rather, it does the reverse (*Jefferson Lines*, 514 US at 180; *see American Trucking Associations, Inc. v Michigan Pub. Serv. Commn.*, 545 US 429, 434 [2005] [upholding such a tax]).

Here, the tax deduction does depend on a geographic distinction between New York and non-New York taxpayers. However, this does not violate the dormant Commerce

Clause unless by operation of that geographic distinction, there is "incentive to engage in intrastate rather than interstate economic activity" (*Wynne*, 575 US at 561). Although it is possible to construct situations where the geographic distinction in former Tax Law section 208 (9) (o) (3) incentivizes intrastate commerce, in other situations, including quite plausibly petitioners' actual situations, the geographic distinction incentivizes interstate commerce. Therefore, we cannot say that the tax discriminates against interstate commerce merely because it speaks in geographic terms (*see Kraft*, 505 US at 80 n 23 [noting the need to evaluate comparators who are "most similarly situated" (citation omitted)]; *Wynne*, 575 US at 563 n 7 [stating that where the effects of a tax may cut in either direction, an "empirical showing" is needed to determine whether interstate commerce would be at a disadvantage]).

VI.

Understanding that the deduction in former Tax Law section 208 (9) (o) turns solely on tax filing status highlights several fatal flaws in petitioners' argument. First, petitioners have not contended, much less shown, that their payor subsidiaries could not have filed New York tax returns, which would have obtained the exact deduction petitioners seek. Second, the tax burden has nothing to do with whether a royalty transaction is intrastate— an "intrastate" corporate group is simply one where the payor and recipient do some business in the same jurisdiction generally. Third, a corporate group may have the lowest possible tax burden if it operates in 1, 100, or 1000 jurisdictions, so long as there is

operational symmetry between the payor and recipient. Fourth, if we assume internal consistency, the drive towards symmetry would tend to encourage petitioners and those similarly situated to increase the jurisdictions in which their subsidiaries do business rather than decreasing the jurisdictions in which the parent does business, favoring interstate commerce. For these reasons, petitioners have not shown that former Tax Law section 208 (9) (o) discriminates against interstate or foreign commerce in violation of the dormant Commerce Clause.  I would therefore affirm the holding of the Appellate Division, though on these different grounds.

For No. 34: Judgment affirmed, with costs. Opinion by Judge Cannataro. Judges Rivera, Garcia, Singas and Troutman concur. Chief Judge Wilson concurs in result in an opinion, in which Judge Halligan concurs.

For No. 35: Judgment affirmed, with costs. Opinion by Judge Cannataro. Judges Rivera, Garcia, Singas and Troutman concur. Chief Judge Wilson concurs in result in an opinion, in which Judge Halligan concurs.

Decided April 23, 2024