Matter of Ciardullo v McDonnell (2025 NY Slip Op 03365)

Matter of Ciardullo v McDonnell

2025 NY Slip Op 03365

Decided on June 5, 2025

Appellate Division, Third Department

Fisher, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 5, 2025

CV-23-1343

[*1]In the Matter of Robert C. Ciardullo et al., Petitioners,
v
Jean A. McDonnell, as Secretary to the Tax Appeals Tribunal, et al., Respondents.

Calendar Date:April 29, 2025

Before: Egan Jr., J.P., Aarons, Reynolds Fitzgerald, Ceresia and Fisher, JJ.

Benjamin Robert Katz, Valhalla, for petitioners
Letitia James, Attorney General, Albany (Kate H. Nepveu of counsel), for Acting Commissioner of Taxation and Finance, respondent.

Fisher, J.
Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Tax Law § 2016) to review a determination of the Tax Appeals Tribunal sustaining, among other things, notices of deficiency of personal income tax imposed under Tax Law article 22.
Petitioners are married and residents of New York. During the years 2012 through 2016 (hereinafter the years at issue), they engaged in an investment strategy that included purchasing out-of-state bonds on the secondary market. Due to the initial interest rate of the bonds being higher than the prevailing market rate at the time of purchase, petitioners also paid an additional premium to acquire the bonds.[FN1] Where the duration of a bond exceeded one year, petitioners further made an upfront premium payment for each remaining year until the bond's maturity. As relevant here, the amount of the premium paid for each year of the bond is called the amortized premium.
On their respective tax returns for the years at issue, petitioners sought to reduce their New York adjusted gross income by the amortized premiums on their out-of-state bonds. Following an audit, notices of deficiency were issued to petitioners by the Department of Taxation and Finance (hereinafter the Department) stating that they owed additional income taxes for the years at issue, plus interest and penalties. Thereafter, the Department determined that petitioners could not subtract the premiums directly from their interest income, but rather may only report such premiums as part of their itemized deduction, and ultimately issued notices of disallowance. Petitioners were unsuccessful at a conciliation conference and sought review with the Division of Tax Appeals, agreeing to have the dispute resolved upon documentary submissions before an Administrative Law Judge (hereinafter ALJ), who ultimately denied the petition. This determination was upheld by the Tax Appeals Tribunal. Petitioners then commenced this CPLR article 78 proceeding to challenge the Tribunal's determination.
We confirm. Our "review of the Tribunal's determination is limited to whether it has a rational basis and is supported by substantial evidence" (Matter of Carlson v Tax Appeals Trib. of the State of N.Y., 214 AD3d 1133, 1134 [3d Dept 2023] [internal quotation marks and citations omitted]). Where that determination is premised on the interpretation of a statute, such interpretation made "by the agency charged with its enforcement is, as a general matter, given great weight and judicial deference, so long as the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute" (Matter of Walt Disney Co. & Consol. Subsidiaries v Tax Appeals Trib. of the State of N.Y., 210 AD3d 86, 89 [3d Dept 2022] [internal quotation marks and citations omitted], affd 42 NY3d 538 [2024], cert denied ___ US ___, 145 S Ct 1125 [2025]). Notably, unambiguous tax deduction provisions are to be construed in favor of the taxing authority (see Matter of Wegmans [*2]Food Mkts., Inc. v Tax Appeals Trib. of the State of N.Y., 33 NY3d 587, 593 [2019]), and "[w]hether and to what extent a deduction shall be allowed is a matter of legislative grace" (Matter of Royal Indem. Co. v Tax Appeals Trib., 75 NY2d 75, 78 [1989]), therefore the party "seeking the benefit of the tax deduction [has the] burden to establish its entitlement to same by pointing to some provision of law plainly giving the deduction" (Matter of Stewart's Shops Corp. v New York State Tax Appeals Trib., 172 AD3d 1789, 1791 [3d Dept 2019] [internal quotation marks, brackets and citations omitted]; see Matter of Charter Dev. Co., L.L.C. v City of Buffalo, 6 NY3d 578, 582 [2006]).
Here, petitioners challenge the Tribunal's interpretation of Tax Law §§ 607 (a) and 612 (b) (1) and contend that they are entitled to annulment of the Tribunal's determination on the grounds of federal conformity. We disagree. The meaning of terms is governed by Tax Law § 607 (a), which requires terms used in the Tax Law to be interpreted in conformity with the federal construction of substantially similar tax provisions, "unless a different meaning is clearly required" (Matter of Black v New York State Tax Appeals Trib., 41 NY3d 131, 139 [2023]). Therefore, where "there is no federal counterpart and the state tax laws specifically and expressly diverge from the federal tax laws, there is no requirement that the court strain to read them as identical" (Matter of BTG Pactual NY Corp. v New York State Tax Appeals Trib., 203 AD3d 1347, 1351 [3d Dept 2022] [internal quotation marks, brackets and citation omitted]). This includes where the state tax law may model or adopt, in part, portions of the federal law regarding certain itemized deductions, but also contains other sections of the state's tax law that reduce the amount allowed for the total itemized deduction based on the adjusted gross income of a taxpayer (see Matter of Karlsberg v Tax Appeals Trib. of the State of N.Y., 85 AD3d 1347, 1348 [3d Dept 2011], appeal dismissed 17 NY3d 900 [2011]; see also Matter of Toronto Dominion Holdings [U.S.A.], Inc. v Tax Appeals Trib. of the State of N.Y., 162 AD3d 1255, 1259-1260 [3d Dept 2018], lv denied 32 NY3d 907 [2018]).
As relevant here, the New York taxable income of a resident individual is defined as "his [or her] New York adjusted gross income less his [or her] New York deduction and New York exemptions" (Tax Law § 611 [a]). A resident's New York adjusted gross income is equal to his or her federal adjusted gross income, with applicable modifications (see Tax Law § 612 [a]). Although the federal law excludes the interest on any state or local bond from an individual's federal adjusted gross income (see 26 USC § 103 [a]), one modification under the state law increasing the federal adjusted gross income, and therefore increasing the New York adjusted gross income, includes the "[i]nterest income" on out-of-state bonds (Tax Law § 612 [b] [1]; see 20 NYCRR 112.2 [a]). Where, as [*3]here, a taxpayer purchases bonds at a premium which have a duration greater than one year, and therefore the taxpayer must make an upfront premium payment for each remaining year at the time of purchase, the federal law does not allow a deduction for the amortized premium paid (see 26 USC § 171 [a] [2]), but does allow the amortized premium to "be applied against (and operate to reduce) the amount of [any] interest payment" (26 USC § 171 [e] [2]; see 26 CFR 1.171-2 [a] [1]; see also 26 USC § 1016 [a] [5]; 26 CFR 1.1016-5 [b] [1], [3]). In contrast, the state law does allow a taxpayer to subtract the amortized premium from any taxable bond interest as an itemized deduction (see Tax Law § 615 [d] [3]), or as an ordinary and necessary expense "attributable to a trade or business carried on by the taxpayer" (Tax Law § 612 [c] [10]). The overall itemized deduction is reduced for high income earners (see Tax Law § 615 [f]), including a limitation to fifty percent of federally allowable charitable deductions for taxpayers with a New York adjusted gross income between $1 million and $10 million (see Tax Law § 615 [g] [1]).
With that backdrop, we cannot say that the principle of federal conformity enshrined in Tax Law § 607 (a) dictates a different result. Indeed, the state tax law expressly diverges from the federal tax laws in that the state tax law handles amortized premiums as a "below the line" deduction to interest income, rather than an "above the line" adjustment like the federal tax laws. Contrary to petitioners' contention, although the state tax law may have been modeled on or adopted part of the federal tax law as it relates to reporting gross interest income against amortized bond premiums, it is also true that the state tax law has clearly "decouple[d]" itself from the federal tax laws by expressly providing for modifications to increasing federal adjusted gross income relating to out-of-state bond interest (see Tax Law §§ 612 [a], [b] [1]; 615 [f], [g] [1]; Matter of Karlsberg v Tax Appeals Trib. of the State of N.Y., 85 AD3d at 1348; see also Tax Law § 607 [a]). Petitioners' further contention in support of federal conformity on the basis that neither the state nor federal tax laws define "interest income," but that the Tribunal's interpretation leads to an arbitrary and capricious outcome resulting in double taxation to petitioners, is unpersuasive. The issue of whether interest income constitutes either gross interest payments (aligned with Tax Law §§ 612, 615) or gross interest payments less amortized bond premiums allocable to the tax year at issue (aligned with the federal tax laws), was answered in Matter of Solomon (2011 WL 2309149, 2011 NY Tax LEXIS 130 [NY State Div Tax Appeals DTA No. 822845, June 2, 2011]), which ultimately interpreted interest income to mean gross interest payments under the Tax Law and therefore rejected the argument that federal conformity required otherwise.
Petitioners' attempt to distinguish Matter of Solomon [*4]on the grounds that the state tax law significantly changed in 2010 when it created a cap on the itemized deduction for high income earners (see Tax Law § 615 [f], [g] [1]), and therefore petitioners were foreclosed from using the itemized deduction to offset the total amount of their amortized bond premiums, is misplaced. Specifically, the "new" legislation does not impact the analysis in Matter of Solomon, which was also premised on a taxpayer not using an itemized deduction for his amortized bond premiums and involved nearly the identical challenge interposed by petitioners. Nor does the change in legislation create a change to the meaning of interest income under Tax Law § 612 (b) (1), but rather creates a separate provision that impacts what amount of interest income, if any, may be deducted by reducing the itemized deduction for high income earners in a manner similar to what has been previously found permissible (see Matter of Karlsberg v Tax Appeals Trib. of the State of N.Y., 85 AD3d at 1348). Moreover, petitioners' reliance on the change in legislation further undermines their position, as they acknowledged using an itemized deduction for amortized bond premiums for several years to offset their interest income — including after the imposition of the high income earner cap in 2010 — and only found themselves imperiled by their increased income pushing them into the cap reducing the total itemized deductions for higher earners. Accordingly, their true objection that they face duplicative taxation appears to not be with the interpretation of interest income, but rather "more properly viewed as a repackaged challenge to that method of taxation" (Matter of Walt Disney Co. & Consol. Subsidiaries v Tax Appeals Trib. of the State of N.Y., 42 NY3d 538, 554 [2024], cert denied ___ US ___, 145 S Ct 1125 [2025]). As aptly recognized by the Tribunal, this is an issue to be addressed by the Legislature — and not the agency, nor this Court for that matter (see Greater Poughkeepsie Lib Dist. v Town of Poughkeepsie, 81 NY2d 574, 579-580 [1993]; Matter of Stewart's Shops Corp. v New York State Tax Appeals Trib., 1 72 AD3d at 1792; see also National Pork Producers Council v Ross, 598 US 356, 382-383 [2023]). Based on the foregoing, the Tribunal properly determined that federal conformity did not require a different meaning of the term interest income under the Tax Law, and we are satisfied that the interpretation by the Tribunal was not irrational, unreasonable or inconsistent with the state tax law (see Matter of BTG Pactual NY Corp. v New York State Tax Appeals Trib., 203 AD3d at 1351-1352; Matter of Toronto Dominion Holdings [U.S.A.], Inc. v Tax Appeals Trib. of the State of N.Y., 162 AD3d at 1259-1260; Matter of Karlsberg v Tax Appeals Trib. of the State of N.Y., 85 AD3d at 1348).
Petitioners also assert that they are nonetheless entitled to annulment of the Tribunal's determination because petitioner Robert C. Ciardullo (hereinafter Ciardullo) qualifies [*5]as a bond trader under Tax Law § 612 (c) (10) — which is not subject to the high income earner cap of Tax Law § 615 (g) (1) — and therefore they should be permitted to offset their interest income against their amortized bond premium payments as an itemized deduction. In support of this contention, petitioners offered the testimonial affidavit of Ciardullo, who averred that he has been trading municipal bonds for approximately 30 years, averaged approximately 20 hours a week studying the bond market, made over 500 bond purchases and sale transactions during the years at issue, and manages several accounts totaling upward of $12 million. Petitioners also offered the testimonial affidavit of Lawrence J. Brown, a certified public accountant, who averred, among other things, that the investment activities and volume of trading that Ciardullo was engaged in far surpassed the trading activity of a passive investor. However, the record also reveals that Ciardullo conceded he is not a bond broker/dealer, not a professional trader, does not complete trades for other people and does not have a license to do so. On the income tax returns for the years at issue, Ciardullo listed his occupation as a medical doctor and did not otherwise indicate he was a professional bond trader. As to the nature of the investment activity engaged in by Ciardullo, the ALJ and the Tribunal observed that the trades made by Ciardullo sought profit through long-term appreciation rather than capitalizing on market volatility. Based on the foregoing, despite the unique and inherent differences between bond markets and equity markets, we cannot say that petitioners satisfied their burden of proving entitlement to the deduction given to bond traders (see Matter of Royal Indem. Co. v Tax Appeals Trib., 75 NY2d at 78-79; Matter of Klesitz v New York State Tax Commn., 107 AD2d 880, 881 [3d Dept 1985], lv denied 65 NY2d 603 [1985]; see generally Matter of Stewart's Shops Corp. v New York State Tax Appeals Trib., 172 AD3d at 1792-1793). Accordingly, we are satisfied from our further review of the record that substantial evidence supports the Tribunal's determination that Ciardullo did not qualify as a bond trader within the purview of Tax Law § 612 (c) (10) (see Van Der Lee v Commissioner of Internal Revenue, 501 Fed Appx 30, 32-33 [2d Cir 2012]; Estate of Yeager v C.I.R., 889 F2d 29, 33 [2d Cir 1989], cert denied 495 US 946 [1990]; see also Matter of Klesitz v New York State Tax Commn., 107 AD2d at 881).
Next, as a result of the Tribunal's determinations, petitioners contend that the Tax Law's treatment of out-of-state bonds violates the dormant Commerce Clause. We are not persuaded. Considered to be the negative implication of the Commerce Clause (see US Const, art I, § 8), "[t]he dormant Commerce Clause of the US Constitution prohibits state taxation, or regulation, that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace[*6]" (Matter of International Bus. Machs. Corp. & Combined Affiliates v Tax Appeals Trib. of the State of N.Y., 214 AD3d 1125, 1126-1127 [3d Dept 2023] [internal quotation marks and citations omitted], affd sub nom. Matter of Walt Disney Co. & Consol. Subsidiaries v Tax Appeals Trib. of the State of N.Y., 42 NY3d 538 [2024], cert denied ___ US ___, 145 S Ct 1126 [2025]). Generally, to withstand a dormant Commerce Clause challenge, "a state tax (1) must be applied to an activity with a substantial nexus with the taxing State, (2) must be fairly apportioned, meaning internally and externally consistent, (3) may not discriminate against cross-border commerce and (4) must be fairly related to the services provided by the State" (Matter of Walt Disney Co. & Consol. Subsidiaries v Tax Appeals Trib. of the State of N.Y., 42 NY3d at 551 [internal quotation marks and citation omitted]). However, although the dormant Commerce Clause is concerned about "economic protectionism" (McBurney v Young, 569 US 221, 235 [2013] [internal quotation marks and citation omitted])and "economic Balkanization" (Matter of Tamagni v Tax Appeals Trib. of State of N.Y., 91 NY2d 530, 539 [1998] [internal quotation marks and citation omitted], cert denied 525 US 931 [1998]), it remains balanced by accepting "a degree of local autonomy" (Department of Revenue of Ky. v Davis, 553 US 328, 338 [2008]). To this crucial point, "a government function is not susceptible to standard dormant Commerce Clause scrutiny owing to its likely motivation by legitimate objectives distinct from the simple economic protectionism the Clause abhors" (id. at 341, citing United Haulers Assn., Inc. v Oneida-Herkimer Solid Waste Mgt. Auth., 550 US 330, 343 [2007]; see McBurney v Young, 569 US at 236).
Specifically, petitioners contend that the premium is part of the principal of the bond, and not being able to deduct the premium is taxing the premium as if it was interest income, therefore resulting in double taxation. Due to this, petitioners claim that they have been discriminated against because they were forced to sell their out-of-state bonds and only buy New York bonds. Despite that point, petitioners concede that there are circumstances where multiple taxation could be avoided; therefore, to the extent that they raise a facial challenge, it must fail as they did not carry their "substantial burden of demonstrating that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment" (Matter of Walt Disney Co. & Consol. Subsidiaries v Tax Appeals Trib. of the State of N.Y., 42 NY3d at 550 [internal quotation marks and citations omitted]). Nevertheless, and related to their as-applied challenge, accepting the possibility of multiple taxation from the circumstances presented by petitioners, "[t]he Supreme Court [of the United States] has long held that multiple taxation of State residents is not forbidden" (Matter of Tamagni v Tax Appeals Trib. of State of N.Y., 91 [*7]NY2d at 544). As particularly relevant here, the Supreme Court of the United States has expressly recognized that the logic between balancing economic protections and local autonomy "applies with even greater force to laws favoring a State's municipal bonds, given that the issuance of debt securities to pay for public projects is a quintessentially public function . . . [and allows for] spread [of] the costs of public projects over time, . . . [and is] thus the way to shoulder the cardinal civic responsibilities [such as] protecting the health, safety, and welfare of citizens" (Department of Revenue of Ky. v Davis, 553 US at 341-342 [internal quotation marks, brackets, footnotes and citation omitted]).
Indeed, each of these benefits is advanced through the state tax laws at issue here. Although the combination of exempting state bond interest and the state tax laws create a direct advantage to bonds issued by New York and its municipal governments, this advantage has a substantial nexus to New York where "it is competing in the market for limited investment dollars, alongside private bond issuers and its sister States, and its tax structure is one of the tools of competition" (id. at 345). Such regulation therefore serves to complement the commercial activities of New York and the in-state municipalities with their civic objective, which is different from the discrimination traditionally held to be unlawful under the dormant Commerce Clause because the state's tax law "favors, not local private entrepreneurs, but the [State] and local governments[,] . . . with an eye toward making some or all of its bonds more marketable" (id. at 348; see generally National Pork Producers Council v Ross, 598 US at 384-385). Such efforts seek to lessen the financial burden on the citizens of New York, who as taxpayers are the beneficiaries of the projects being funded and ultimately have no choice but to pay for these projects whether they are successfully funded through bonds or another means (see Department of Revenue of Ky. v Davis, 553 US at 358-359 [Stevens, J., concurring]; San Diegans for Open Government v Public Facilities Fin. Auth. of City of San Diego, 8 Cal 5th 733, 747 [2019, Cantil-Sakauye, Ch. J., concurring in part, dissenting in part]). In light of this, we are satisfied that any burden of possible multiple taxation imposed on high income earners who did have a choice and voluntarily entered the bond market is not " 'clearly excessive in relation to the putative local benefits' " (United Haulers Assn., Inc. v Oneida-Herkimer Solid Waste Mgt. Auth., 550 US at 346, quoting Pike v Bruce Church, Inc., 397 US 137, 142 [1970]). Accordingly, while not perfect, the state tax laws at issue are not inherently discriminatory and, to the extent that multiple taxation may sometimes occur to high income earners such as petitioners, it is the incidental result of a nondiscriminatory and internally consistent tax scheme that is not clearly excessive to the local benefits [*8]generated as part of the State carrying out legitimate objectives (see United Haulers Assn., Inc. v Oneida-Herkimer Solid Waste Mgt. Auth., 550 US at 346; Brady v State of New York, 80 NY2d 596, 605 [1992], cert denied 509 US 905 [1993]; see also Matter of Walt Disney Co. & Consol. Subsidiaries v Tax Appeals Trib. of the State of N.Y., 42 NY3d at 555).
Lastly, petitioners challenge the state tax laws under the Contract Clause (see US Const, art I, § 10 [1]). "In evaluating a claim of contract impairment, the Supreme Court of the United States has adopted a three-prong test, with the first prong requiring consideration of whether the complaining party has shown a substantial impairment of a contractual relationship" (Matter of National Energy Marketers Assn. v New York State Pub. Serv. Commn., 167 AD3d 88, 98 [3d Dept 2018] [internal quotation marks, brackets and citations omitted]). Upon satisfaction of this first prong, the Court then asks whether the state law at issue "serve[s] a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, . . . are the means chosen to accomplish this purpose reasonable and necessary" (Matter of Buffalo Teachers Fedn., Inc. v Elia, 162 AD3d 1169, 1176 [3d Dept 2018] [internal quotation marks and citation omitted], lv denied 32 NY3d 915 [2019]). Although petitioners have shown that the state tax laws impact how they could maximize their income tax return, they have not provided evidence to support a showing of any substantial impairment of a contractual relationship between themselves and an out-of-state bond issuer (see Matter of National Energy Marketers Assn. v New York State Pub. Serv. Commn., 167 AD3d at 98). But even assuming that petitioners could demonstrate such substantial impairment, as noted above, the state tax laws serve a legitimate public purpose — namely, raising funds for public projects — and do so through reasonable and necessary means (see Matter of Buffalo Teachers Fedn., Inc. v Elia, 162 AD3d at 1177-1178; see generally Department of Revenue of Ky. v Davis, 553 US at 347-348; United Haulers Assn., Inc. v Oneida-Herkimer Solid Waste Mgt. Auth., 550 US at 346-347). We have examined petitioners' remaining contentions and have found them to be without merit or rendered academic.
Egan Jr., J.P., Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.

Footnotes

Footnote 1: A bond "premium" is a price paid for a bond over the face value given its interest rate and the market interest rate at the time the bond is being sold in the secondary market — as compared to the interest rate at the time the bond was originally issued, which does not change.